Good morning. Good morning, Honors. May it please the Court. Cormac Early with Jones Day on behalf of Walter Cook, and at Council's table I have with me Kelsey Israel Trommel. Walter Cook was 18 years old at the time of his arrest and interrogation in this case, but he had the mental capacity of a 10-year-old, and he did not know that he had the right to have counsel present during questioning. The District Court established each of those conclusions as a matter of fact in the opinion below. Well, just a minute, Counselor, if I could just a second. It's my understanding that, and I'm just trying to make sure I have this down, that the petitioner filed a habeas petition with the California Supreme Court. That's right. And in that, the Supreme Court ordered the Department of Corrections to show cause why the conviction should not be vacated and that the petitioner not be given a life sentence because he was mentally retarded? The sentence of death, Your Honor, yes, the conviction stood. And frankly, the Supreme Court, after ordering this order to show cause, said that it shouldn't be vacated? That the order to show cause why the sentence of death should not be vacated. Right, and it wasn't vacated by them? It was vacated, Your Honor, yes, the sentence. I know it was vacated, but I understood that was in the Superior Court thereafter? Yes, Your Honor. Not in the Supreme Court? No, Your Honor. And the Supreme Court denied, summarily denied? They denied at all? Yes. Conviction and sentence affirmed? With the exception of the Atkins round, yes, Your Honor. With the exception of? Of the Atkins round. All right. So basically, the Superior Court would have to be the one to do the resentencing anyway. It was basically an OSC, which would give, for some reason, it seems like it got lost a little bit in the Superior Court, and it took a little while before. It did, Your Honor, yes. I have no idea exactly what was going on, but it seemed like it was a couple of years before that happened. Yes, it took, I think, about four years in the Superior Court, and I'm not sure why. Is the Superior Court's Atkins decision in the record anywhere? I looked and wasn't able to find it. I'm just curious, aside from finding that Mr. Cook was intellectually disabled, was there any other findings that Superior Court made that might be relevant here? I don't believe so, Your Honor. My understanding is that it was not contested in the Superior Court, but I may not be able to answer that. I don't mean that it was contested. I just mean, was there any findings regarding his? No. Not that I'm aware of. Well, and then also, too, Judge Alsup, I believe, did not deal with the issue of voluntariness and all of that, that he jumped over and handled it on the prejudice prong, correct? That's right, Your Honor, yes. The coercion. He didn't really jump over. He found that he was intellectually, that he was not able to appreciate and have a knowing waiver of the Miranda. Right. So Judge Alsup found that the waiver was not valid, and so that and coercion kind of get to the same point, which is the prejudice inquiry. Well, but he, as I understand it, and I just want to make sure, he found the Miranda warning was not knowing and intelligent, but he did not really meet or didn't get to, if I understand, the voluntariness. That's right, Your Honor. And would we, if we found that, you know, it was not knowing and intelligent, I mean, do we go right to prejudice as well, or do we have to deal with the voluntariness? You certainly could, Your Honor. There's no, once we get to the point of the confession being, for either of those reasons, invalid, there's no need to examine the other. Well, if we were to find that there was no prejudice, regardless of meeting all of that, it can be resolved on prejudice, one way or the other. If you were to find that there was no prejudice. If you found that there was prejudice, of course, you have to find the violation. Right. Then you have to, exactly, yes. And if you find prejudice, then that would, that then vacates the entire sentence, correct, and the trial. As to the convictions for which there was prejudice, which we maintain as all three of them, yes. So that's what, I mean, you're taking the position that it would, so then he would have to be retried on all three of the murders, correct? Yes, Your Honor. So let's, if I could just ask you about the prejudice part of this appeal. The California Supreme Court relied, and I want you to double check me on this, relied on the confession and the statements that Mr. Cook made about the gun to uphold the motion to sever. Is that right? On direct appeal, Your Honor, yes, I believe. Sorry? On direct appeal, I believe, yes. All right. So is that, isn't that evidence of prejudice here? If that confession doesn't come in, then what's the likelihood that the murders would have been tried together? I think without that confession, without that link, the likelihood is extremely low, because, in fact, what the evidence, the forensic evidence from the ballistics shows, there was a gun linking the Bettencourt and the Morris homicides. Well, there were also witnesses. There were some witnesses that cross-transferred in those. The witnesses across Bettencourt, there's only the gun and Walter Cook present at both. There's no witnesses that link? Overlap between Bettencourt and Morris. There's some overlap between Morris and Sadler. Sadler. Yes, Your Honors. But the forensic evidence establishes that, in fact, Stephen Sims fired the gun in the Bettencourt homicide. Well, that was part of the argument. That's argument. It isn't necessarily established. Well, our position is that it's sufficiently clear on the record that there is no possibility for fair-minded jurists to disagree, because it's undisputed that there were five bullets recovered from Bettencourt's body. It's undisputed that two of those bullets, numbers 8 and 9, were the fatal shots. And it's undisputed that shot number 16 came up and through Bettencourt's right leg from a position that only Stephen Sims could have occupied, because there is no evidence anywhere in the record that Walter Cook was in a position to fire up and through Bettencourt's legs. But that's where everyone was. But how was the case tried? How was the case tried? I thought that the case was tried that he somewhat — that he was guilty of the Right. And so what trial counsel did is it took the most helpful possible evidence for the defense, which is ironclad ballistics evidence that my client did not commit the crime, and turned that into the strongest possible evidence for the prosecution by affirmatively admitting to my client's guilt and, still worse, admitting that his confession to Bettencourt, which was essentially identical to the quote-unquote confession in the Morris homicide, was right, but that he had not confessed in Morris. In both cases, what Walter Cook essentially said was, I was there. I had a gun. I don't remember what happened. I blacked out. But I must have done it if you said so. And the prosecution pointed this out over and over again. I'm still looping back a little bit on your statement that you're saying if you find prejudice that they couldn't have tried the cases together, because these are like three murders that occur within basically a two-and-a-half-month period of time. The first one, there are two in February and then another in May. Yes. And it's the May one that then triggers and goes back and loops in the first and the second one, right? And they're all in East Palo Alto? They're all in East Palo Alto. There is a gun in common between the second and third murders. Yes. But there is really nothing in common between the first and third. Well, except for – except there are witnesses that, albeit they recant their testimony, when they come to court, there are witnesses that some are the same, I think, on the Sadler and the Morris, right? Yes. So you have some of the same witnesses. You have all of the same area. You have the same person charged with all of those crimes in a short proximity. I mean, join during California isn't that hard in terms of that to try three murders together, as far as that goes. So I'm not really following your argument that if you find prejudice. Let me ask this question, if I could. If the confession and the statements about the gun were taken out, what evidence is left connecting the three murders? Is it the bullet casings and then the singular testimony of Chante Early? So Chante Early testifies on Sadler and Betancourt, but not Morris. So she doesn't connect. So what is left connecting them? Nothing, Your Honor. Well, okay. I can't really – I'm not saying that whether – I'm not making a comment on the strength of it, but to say that there's nothing in terms of because you have several witnesses that connect your client with these crimes and then they recant a trial. And the way you try a case like that is when someone recants, then they read – then their prior statements get read into the record and then the jury heard everything that they've said. And obviously the jury didn't believe that they really didn't know anything. You know, implicit in the fact that they found him guilty of three first-degree murders and went forward, it means that despite the fact that there were inconsistent statements, they resolved those issues of fact at the trial. And I don't know how we can reach back on that. Well, Your Honor, our prejudice argument is not primarily on the Joyner issue, although we agree that on Rima that would be appropriate for the district court to resolve. It hasn't been briefed at all so far in this case. It's also that just directly the introduction of the confession to the Bettencourt and Morris killings prejudiced all three directly, most obviously with Bettencourt where it is simply not disputable on the ballistics evidence that my client could not have fired the fatal shots. So what did he really confess to? It wasn't a great confession. It wasn't like he crossed every T and dotted every I. There was a lot of, and in fact I guess wound up in all of this, that counsel at trial, your client didn't testify at trial, right? No, Your Honor. So they put in the statement, they put in that particular statement and also part of it where he's really crying and he's really worried about his mother and which could arguably be things that defense counsel could have thought were positive for your client. So he didn't really, what did he really confess to? Maybe I blanked out. Well, what he said in each case was I was there, I had a gun, I blacked out, I don't remember, but I must have done it. And what his attorney said is we agree this means he confessed. And I see that I'm eating into my aspirational rebuttal. Keep going. What did you want to leave for rebuttal? I'm sorry. I wanted four minutes, Your Honor. Okay. All right. We'll just keep, we have questions. So were all the statements Mr. Cook made about the gun obtained from the interrogation that's at issue here? Yes, Your Honor. And the trial strategy by the defense counsel was significantly influenced by the confession? It was, yes, by the confession and by an absolutely crucial misunderstanding of the ballistics evidence, Your Honor. So the trial counsel, and you'll see this in his declaration, thought that the ballistics evidence established that there was a strong case that there were two guns. That was wrong. That was unambiguously, clearly wrong. And in fact, during trial, Cook's own counsel aggressively pursued the two-gun theory and tried to get the State's forensic expert to agree to it, and he would not, under pressure. Because what the expert actually said was that three of the bullets, the three that were found at the crime scene rather than in Bettencourt's body, were so badly damaged that they simply could not be matched to anything. So the fact that it was inconclusive as to the bullets, that allows arguments both ways. I mean, a prosecutor can say they're the same, but they were badly damaged and they can't say it. Defense counsel can say, hey, they didn't, you know, we can argue that they belong to another gun. And the expert wouldn't, couldn't say with certainty either way, right? I mean, the expert sort of stuck to his guns or what, as it were. And the point is that the trial counsel should have, Cook's trial counsel should have argued that there was one gun. Because we know that Stephen Sims fired at least one of the shots that left a bullet in Bettencourt's body, and we know that all the bullets in Bettencourt's body came from the same gun, meaning that Stephen Sims fired them. And we know that two of them were the fatal shots. It's not disputed. So even if there were other shots. Well, how do you know that with certainty? Based on the State's own evidence and what their experts would have testified to if asked in their declarations. So we know from Dr. Benson's declaration, he examined the bullet trajectories, that shot 16, which according to Sims' testimony was the first shot, came up through Bettencourt's right leg from a position consistent with someone who was crouching down in front of the door, which is where every witness places Sims and no evidence whatsoever places Walter Cook. So only Sims could have fired that shot. Then we know from the State's ballistics expert that all five of the bullets recovered from the body were fired by the same gun. None of this is disputed. And then we also know from Dr. Benson, again, that two of the shots, eight and nine, which left bullets in Bettencourt's body were the fatal shots. They were independently sufficient to kill him. Still none of this is disputed. Now the State says that the angles of the fatal shots were coming from downwards, meaning that Sims didn't fire those when he was crouched down. But that's consistent with his testimony because he said that he stood up after the firing started. So there's no evidence whatsoever that points to the existence of a second gun that Walter Cook may or may not have fired. There is, at best for the State, some evidence that does not rule it out. But even with that, it's a very simple argument for the jury to hear five bullets, two of them fatal, all from the same gun, and one of them absolutely certainly from Sims, all undisputed. And if the jury hears that, they know that it's not physically possible for Cook to have killed Bettencourt. And so his confession, even if it had been introduced, would in fact be seen as it was, as a coerced confession, as one that was not fully voluntary, the product of an impressionable and traumatized mind. Let me go ahead. I was just going to say, now we're back to the confession again. Yes, Your Honor. I'm still worried about the Miranda waiver and why that is not at least a valid Miranda waiver, given what I owe deference, epideference, to the California court. And I'll tell you why I worry about that. The record evidence shows there was a videotape showing that your client is calm, not confused, in no emotional distress or physical distress. He was repeatedly advised of his rights on arrest two times during the interview, and each time he confirmed he understood them. After the waiver, he appropriately answered all the questions, provided all the relevant details. He'd been arrested previously, given his rights, understood, confirmed those facts. With all of that, all we have are, if you will, what occurs later or what experts say. Why does that undo this epideference? So the short answer, Your Honor, is that epideference does not apply in this particular case. Why? And that's because the State court made no factual findings. And the Supreme Court in Brumfield v. Cain was absolutely clear that the Harrington logic of hypothesizing possible reasonings for the State court's decision when they don't say anything applies to legal conclusions, but it does not apply to factual conclusions. And so in Brumfield, the Supreme Court reviewed the district, the Federal District Court's findings for clear error. And clear error review is the standard here. And so you're, so you're, if Ed, if we disagree with you and say Ed applies, do you lose? No, Your Honor. We don't believe so. Based on the overwhelming, unanimous expert testimony that is entirely uncontradicted, the State's own admission below that my client exhibited a probable inability to process the Miranda warning. But what specifically was wrong? I mean, I thought there were issues. He didn't know his own birth date. Is that correct? Yes. But tell me about that and anything else that you think undermines his knowing. Right. And so to be clear, the question for the Court is whether my client understood his rights as opposed to whether the interrogating officers understood his disabilities. But in this particular case, it should have been immediately obvious to them when he said what his birthday was and then he said what his age was, and they didn't match up. And we know because Inspector Saban immediately realized this and said, hold on, that doesn't make sense. If that's your birth date, then you must be 19. And Cook's response is simply inexplicable. It is not a response that any fully intellectually competent person would give, which is you could say, oh, that was a slip of the tongue. I meant 1973 instead of 1972. He didn't say that. He said, that's what my mother told me, meaning he hadn't processed that the simple math didn't work, which suggests that when he said, yeah, I understood my rights, that he hadn't processed that either. And that's fully consistent. That's a good argument. But I guess what I'm trying to say is these kind of, if you will, arguments about what the facts say and what they don't say were the same things that were in front of the California Supreme Court. Right. And the California Supreme Court said these are denied on the merits but didn't say why. I understand that. And so that's why I'm trying to push you just a little bit. What more could the detectives have done to demonstrate that he understood his rights? Or was he simply incapable of ever understanding them? I'm not sure he was incapable of ever understanding them, because the next day – What more could they do then? Well, they could have done what they did the next day, which is to say – so on the first day, the day that we're concerned with, they say, you have a right to an attorney during any questioning. And it becomes apparent on day two that Walter Cook understood that to mean questioning at trial. And so what they could have said is, you understand that means you have a right to a lawyer right now, which they did on day two, and then he came close to understanding it. I guess that worries me just a little, because if he was mentally incapable of understanding his rights on the first day, why was he suddenly capable of understanding them the next day? Well, I certainly wouldn't agree that he was suddenly capable, Your Honor. Doesn't that raise some suspicion that that statement made the second day was simply an attempt to undo his confession? So that is a possible perspective, but I think it doesn't hold up in light of the record. But I want to make sure to be clear that on the standard of review here, because the district court did make fact findings, and the state court didn't. So the standard of review here is for clear error. Now, putting that aside, whether reasonable jurists could agree that – or could think that what actually happened here was that Cook understood his rights, waived them, realized, oops, I shouldn't have done that, and then came up with a scheme essentially to say, no, I didn't know what was going on. Well, we're free here if we chose to. And I'm not saying we're choosing to, but we could find that it was knowing involuntary. We're not bound by what Judge Ossoff did. You would have to find that he – Well, we have the video. I mean, that's what he looked at. And you have the video and you have all of the, again, voluminous and uniform expert testimony about in light of Cook's condition. But you're arguing that we have to apply a clear error review to the factual findings of the district court on the Miranda claim, right? Yes. Yes, Your Honor. And so do we have to apply a clear error to the prejudice finding as well? No, Your Honor. So to be clear, the prejudice, ultimately the claim as a whole must in some way satisfy 2254D. And our position is that on the first part of the claim, whether there was a violation or not, we've got a fact finding to which clear error review applies. Then we move on to prejudice, and there it's de novo review of the district court's conclusion. So no difference there. De novo of the prejudice and not of the original finding by the district court. And give a reason other than that you like one ruling and you don't like the other. I mean, what case are you relying on? Because to be fair, it seems to me that when you're dealing with the cases that you cite to me, you really don't put a case in front of me as to why. I mean, I've got a case that says why I should not rely on what the California Supreme Court did, and instead I should look at what the district court did. But there is also a case which says that if the California Supreme Court doesn't give me any, I can de novo decide it myself. And I don't have to do anything that the district court. I don't have to give a deference. I can make my own consideration. Then you say, but you've got to review what the district court says for clear air. But when it comes to prejudice, no, it's all de novo. What cases get you where you're going with these arguments? So I think the case Your Honor is referring to is Harrington, which says that I've got Harrington, but I don't know that that supports you. No, we're not arguing that Harrington does support us. Our argument is that Brumfield v. Cain, which is a case the Supreme Court decided after Harrington, does support us. So Harrington says when the state court could have had any one of a number of different legal rationales, it's not enough for the petitioner to knock down one of them. You have to knock down all of them because you have to show that the judgment could not have been correct. But that doesn't resolve the question of when the state court may or may not have made a factual finding at all. So the first step is Townsend v. Cain establishes as a matter of federal law that when it's not clear that there's a fact-finding, because, for example, on the confession, the state court could have decided entirely on the legal basis of prejudice without finding any facts at all. So as a federal matter, Townsend v. Cain establishes. But there's no finding on voluntariness. You agree with that? Right. That when there is no fact-finding, either implicitly or explicitly, there's nothing for the Federal court to defer to. And then fast-forward 50 years to Brumfield v. Cain, where the Supreme Court, after Harrington, says, and cites Harrington, says, we accept the logic that you have to come up with all the different legal rationales that the state court may have had. That is not true for fact-finding. And it explicitly, it is holding of the court, says the state court made no fact-finding in that case about the age of onset of intellectual disability. And so the Supreme Court reviewed the district court's factual finding on that question for clear error only. But the problem comes in that I do not understand the difference, and that's why I thought Judge Murkia's question was especially good. I do not find any difference between where you're finding error or you're finding prejudice. They're both fact-findings. Well, the prejudice. Why is the prejudice prong not a fact-finding? So the, to be clear, the violation prong is formally a mixed question of one fact. Well, you're really arguing that the violation prong has to do with facts, and therefore we have to give clear deference to the district court.  So the prejudice. I mean, there were facts about prejudice that he found. Why don't I have to give them the same deference? I want to be absolutely clear, Your Honor. I think on any level of deference that you could give to the district court's conclusions on prejudice, it would still be wrong. And that's because the district court clearly misapprehended the ballistics evidence. But putting that aside, the standard of review of that question is de novo. And prejudice is a legal question. Ultimately, because it's AEDPA, there are two layers. But the first layer is. But you just said AEDPA doesn't apply. No. I want to be clear, Your Honor. AEDPA applies overall to the legal conclusion of whether the claim of a Miranda violation with prejudice entitles my client to relief. Okay. If that makes sense. Now, there's clear error review for the first step of that, because the district court has already found it. All right. Well, we're going over anyway, so we're here to ‑‑ I want to ask you about this. Cook did not raise his factual allegation that Sergeant Eatman threatened him at gunpoint during the interrogation until a state habeas proceeding over ten years after his trial. But this was an incident that occurred prior to trial. So Cook presumably knew of these facts and could have raised them at that point. What's showing? Do you make that Cook exercised due diligence in pursuing this claim when he could have? So to be clear, Your Honor, that goes to the coercion prong. And both coercion and knowing an intelligent way ultimately end up at the same starting point. I know. But he knew about that. And if he was ‑‑ I mean, coming up with that ten years later, because I think that, what, the district court wouldn't give you a hearing on that, because said you could have ‑‑ there's nothing in there that, you know, it just comes up ten years later. That's ‑‑ you don't have to be very smart to know whether someone pointed a gun at you in the middle of an interrogation. So his intellectual limitations wouldn't seem to prevent him from ‑‑ so I'm having a hard time on the diligence there. Well, so taking this in each step, at the time, should he have said, you just pointed a gun at me and told me to confess? That's certainly a possibility, but remember that at the time, as the uniform expert testimony confirms, he was actively dissociating in a state of simply unable to process information or to provide a reliable confession. He was doing what he was told, essentially. So at the time, there is at least strong evidence for why he didn't say it. So did he just remember it ten years later, or what? I mean, there's nothing ‑‑ Well, the record doesn't disclose when he remembered, but more importantly, Your Honor, the district court didn't reach this at all, because ultimately, the entire ‑‑ and there is other evidence of coercion even without reaching this particular claim. But ultimately, either coercion or an invalid waiver get us to the same point, which is, was there prejudice from the introduction of the statement? Well, is there anything in the record you can point to me that that was diligently brought forward? Not that I can think of, Your Honor, although I will say that diligence is not one of the recognized prongs for whether or not a fact-finding is required. It's merely whether the allegation, if true, would entitle my client to relief. Now, that's undisputed. Of course, if he was coerced at gunpoint into confessing, that would entitle him to relief, assuming, of course, there's prejudice, which we've been discussing, and then whether or not it is demonstrably on its face, merely self‑interested, false. But there is evidence in the record that, in fact, Sergeant Eatman was a violent individual with racist proclivities and a tendency toward dishonesty and lack of integrity, with a reputation for violence. So on the face and after the alleged incident, Cook says, you know, you can go ahead and shoot me, which, to Your Honor's earlier question, may well be a reference to the threat to shoot him. Okay. Do either of you have any other questions right now? None at this time. Okay. You'll have four minutes for rebuttal. Okay? Thank you. All right. Since we've gone over, we'll go as much over with you as we need to go over as well, recognizing that you don't have rebuttals. So go ahead and state your appearance for the record. Good morning, Your Honors. Deputy Attorney General Sarah Farhad on behalf of Respondent. Pull the mic down a bit. Thanks. Is that better? Yeah, I think so. Okay. Your Honors, the Supreme Court has advised that federal habeas relief is reserved only for cases involving extreme malfunctions in the state criminal justice system, and this is simply not one of those cases. I want to begin by pushing back quite a bit on the idea that the District Court made any factual findings in its opinion in this case. It's simply not what happened. Okay. Before you do that, and I want you to get into that, I just have a question. The California Supreme Court invoked several procedural bars in its habeas decision. However, you did not argue in your brief that these bars applied. Should we treat this as waiver on your part, or do any of the procedural bars apply to the petitioner's claims? We're not arguing that any of the procedural bars apply to the claims that have been raised. Okay. So go ahead, then. So what's the standard of review for factual findings on the Miranda and the coercion question, since there haven't been any findings at the state court? You just said you don't think we look at the District Court, or you don't think that the District Court made factual findings. If they did make — if the District Court did make factual findings, do we review that for clear error? The District Court did not make factual findings because the District Court reviewed all the claims raised under D-1, which is the reasonable application and contrary to prong of 2254. And it did that because there were no factual findings made in the California Supreme Court summary denial. So D-2 would apply to the state courts. The D-1, so the — when he — when Judge Alsup — Well, but that's — are you saying that there's no allegation of unreasonable determination of the facts, or are you saying that the District Court didn't make any factual findings because those are two separate things? I'm saying both. I'm saying that there is no analysis under D-2 because there's no state court factual findings. And I'm saying that when Judge Alsup resolved the claims, he was applying D-1 and Richter. So in order to make factual findings at the District Court level, my understanding is there would be — there would have to be some sort of a hearing where the District Court is presented with new facts, not presented to the state court, in order to make a factual finding that this court would review for clear error. So all the District Court was doing is applying, if you will, the general precedent that under this argument, the habeas corpus, what arguments or theories supported or could have been supported? Yes, that's precisely what he was doing. He was looking at the objective facts from the state court record that were before the state court, and he was applying the law. And he was determining whether or not there were any reasonable bases under D-1. So — but you disagree with what the District Court did on some level, correct? That's correct, Your Honor. All right. Well, then why don't you explain that? Because you agree with the District Court on the prejudice analysis, but you don't agree with the District Court on what? And — Correct. And I don't agree with the District Court because I don't think the District Court faithfully applied D-1 to the record. I think what happened was the District Court saw the mental health evidence presented by the experts, and he was very persuaded by it and kind of sidestepped the whole, let's look at the entire record and see what theories either could have — well, in this case, could have been, because we don't have any state court reasoning — what theories could have supported the denial. And only if he could have concluded that there were no reasonable bases for the state court's denial could he then have reached the conclusion that he reached. But he didn't really — he focused — it was really more like a de novo review of the evidence, not giving the state court's denial the deference under Richter that it should have gotten. And that's where I disagree with the District Court. Well, we looked to the totality of the circumstances to determine if a waiver was voluntarily — was voluntarily intelligent. Do you agree with that? I agree with that. Okay. But at what point in time — I just want to understand your view on this. At what point in time do we look at those facts? Is it the totality of the circumstances known to the officers at the time, or the information available at trial, or the information available at the state habeas court? Our position, Your Honor, is that the most relevant timeframe to look at it is what's occurring at the time of the advisement and the waiver. And I think you make that point during your briefing, but I didn't see a case site to that, and I'm just trying to figure out what is your case — your best case that supports that. Because the relevant question appears to be is whether or not the petitioner understood that he was waiving his rights, correct? Correct. So why would it matter that the officers perceived at that time? And I want to give you a chance to make that point for me, please. I appreciate that. I don't have a case to cite to the court. It's more of just considering the totality of what we know from the state court record. And, I mean, we have — we're, you know, two decades beyond — you know, three decades beyond what happened back then. And we have the benefit of the record and things that were developed post the record — or post advisement and waiver. But I think that, you know, what we — what we — the focus should be is on what happened. Okay. So it looks like you put a lot of reliance on the petitioner having been arrested and Mirandized before, at least from your briefing. That's what you point to to say that it was knowing. But I'm just trying to figure out what's the basis, I mean, for the significance of that. Just the repetition of it would be compelling? Because I'm — how do we know that he understood it in those previous times? I think that's just one factor that you look at, Your Honor. And do you think that's a strong factor? I don't think it's the strongest factor. Okay. No. I think the strongest factor is that he was able to understand — had the ability to understand and then invoke his rights less than 24 hours later. Okay. What about all the mental health testimony that came in? The mental health testimony applied equally on the 27th as it did on the 28th, and they don't explain how he was able to understand and invoke on the 28th when he couldn't do it the day before. Well, but I think they — well, go ahead. No, go ahead. I didn't want to cut you off. Well, he — why couldn't he — I'm just trying to figure out why couldn't he have just — wouldn't have just said, I changed my mind, I don't want to talk without a lawyer? I don't know why he wouldn't have said that. He could have said that because he said it on the 28th. And just to be clear, he didn't — he questioned or he talked about, well, aren't I supposed to have a lawyer here or something? But he eventually evoked his right to remain silent. He said he didn't want to talk anymore. He didn't want an attorney there at that time. He didn't want to talk anymore. And the officers respected that. Isn't it true that counsel, when counsel was determining what to do with this, Miranda, had some experts think about the mental health of the petitioner at that point? Mr. Cook was evaluated by at least three experts prior to trial. So, yes, he — counsel did take that step. And so do we have those experts' records in the — do we have those experts' opinions in the record? Yes, Your Honor. You have Dr. Lynch's — not only his report and all of his findings, you have declarations from the other two. And then, on the other hand, we have expert opinions afterwards in the record, which would suggest that he was not competent, correct? That's correct. So we have conflicting mental health testimony about that particular situation? There was no opinion given by the pretrial experts on the validity of the waiver and his ability to understand his rights. All of those opinions came after. So they're inconsistent, certainly. I don't know if they — I would hesitate to say they conflict exactly. All I'm trying to do is, if I'm trying to apply what the habeas court — what arguments or theories supported or could have been supported, it seems to me — and I'm supposed to back off and look at all of the evidence now, not just at the time, but all of the evidence now, then I've got to look at all the evidence that has been put before us, have I not, on whether we could really say he was — he could not waive that, could not make a Miranda waiver? Well, certainly that's what was before the state court. And so in determining whether or not there are reasonable bases in the record for the state court's denial, absolutely the court would have to review. But the problem comes in that if I take about — if I look at this and I look at it per review, on it per review, given what the Supreme Court does, did, it seems to me I'm at the could have supported or did support. I'm not at, well, you've made a finding and now I have to find if you're wrong or not. Correct? Yes, Your Honor, that's correct. Let me ask you about prejudice. Could these murders have been tried together without the confession and the statements about the gun? Would you honestly have tried to join them at that point? I can't say what I would have done, Your Honor, but I think that the points that Judge Callahan raised that do connect. Why can't you say what you would have done? Honestly, I've never tried a triple murder case, so I don't know. Okay, well, thank you. You weren't the trial lawyer? I'm not a trial attorney. I don't know whether there would have been enough for this prosecutor in this case to do it, but I think that looking at the record, there are some things that connect. Tell me what's connecting. Well, you have on the Morrison-Benton court, you've got the gun, you've got the ballistics, and I understand opposing counsel's arguments, but you've got autopsy bullets that match both. You've got witnesses to both who say they heard what they heard Mr. Cook say. They saw him do what he do. They heard him afterwards explain himself as to why, well, at least for Benton court, why he did that. And there is the consistency that he's the only person at each of the crimes. He's the linking thread between those two. I guess what I'm, well, I appreciate that, but it seems like a confession obviously is highly prejudicial, and there's a Supreme Court case law that says it's like no other evidence, and I also understand it's possible that evidence in a case could be so overwhelming that an improperly obtained evidence that was introduced at trial wouldn't prejudice the defendant. But can you point me to any cases where that's happened? Not off the top of my head, Your Honor, but I think that the admission of any confession in any case is going to carry prejudice, I mean, in the sense that it's probative, it's so relevant. So it's really highly— Well, when you use the word probative versus prejudicial, prejudice is not, it has a different meaning under the law. Prejudice, of course, if the probative outweighs the prejudice, but here you're analyzing take it out, let's just assume that it shouldn't have come in. Take it out, and then would he have been convicted? That's right. And so what's the evidence that would have convicted him without it? And I think you also have to look at the nature of the confession. How much of a confession it was is how prejudicial it can be. And that was when I was asking counsel for the petitioner about, I mean, it's not a really great confession. I mean, he doesn't admit each and every element of the crime, or he doesn't do things like that. So then you have to, but if you take it out, what's left? You have the gun, and you have different witnesses saying different things who don't testify, they're impeached at trial, and you've got him hooked to three murders. So— I would agree with all of that, of course. Well, but I'm trying to figure out, I'm confused about this, how now we're arguing, petitioners arguing, that the three cases wouldn't have been joined but four, and therefore you can't consider the fact that he's got three murders in front of the jury. Of course, if, you know, of course it's a different case to a jury if you have one murder. I mean, they're three murders in a two-and-a-half-month period of time. So I don't know how this argument about the, it seems that they're trying to unwind the joinder by, and I don't know if you could do that here. Well, and I don't know, Your Honor, if you can necessarily do that either. I mean, when the questions came about joinder, I was a little confused. That's not an issue that was really necessarily raised in the briefing. But if it goes to prejudice, if that's where Your Honor— Well, it just seems like the confession was central to having these cases tried together. It had a far-ranging impact on this case. Because I'm trying to figure out, can we really say, even if we set aside trying the three separate murders together, the trial seems to have been built around the confession. The prosecution used the confession and the other statements he made to argue that Cook confessed to both murder. The defense's trial strategy was based on acknowledging the confession and the guilt for one murder. It seems to me that the trial was built around the confession, and if it came in improperly, there's a very serious risk of prejudice. That's all I'm trying to explore. And so can you respond to that? Well, I think that the confession really was only to the Bettencourt homicide. And I don't even know that it was a full, yeah, I did it, and this is why I did it. That's not what the confession was. With Morris, as the record and as it's been argued, what it more was is, well, I was in the car and I had a gun and then I blanked out. I couldn't remember. But the jury heard the confession, and you don't think they were affected by the confession of the Morris that it affected the Bettencourt. How can you say that it didn't? I'm not saying that it didn't necessarily. I'm not agreeing with Your Honor that the entire case was built around it. You don't think it was? I think that there's so much other evidence going on. I think that there's, you know, the confession very well could have cut both ways. Do you agree that a good portion of the witness testimony was compromised? Well, compromised in the sense that they made statements and then they recanted or impeached. Yes. There was a lot of.  All that was before the jury. Right. That's right. Both statements were before the jury. The defense counsel argued quite strenuously about police coercion. That was before the jury. Sergeant Eatman. Can we revisit that, though? If the stuff that was argued before the jury, I mean, they clearly were inconsistent statements, and they clearly, this is not an atypical case from the standpoint where people tell the police one thing and then when it comes time for trial and they have to live in the neighborhood and it wasn't, Mother Teresa was not any one of these witnesses. You know, these were all people that lived in the neighborhood and there was a lot of, you know, people had records, you know, people had their own troubles, you know, all of that, and they had relationships with the defendant, and they clearly backed off. They completely peddled backwards at trial, but then the other statements came in. So that being said, could the jury have convicted the defendant if they believed the recanted statements? If they believed not the prior statements but the trial testimony? Well, the jury had to resolve what they believed happened. On Sadler, for example, the confession didn't come in on Sadler, right? Correct. So, and the witnesses, who were the witnesses on Sadler? Sadler wasn't a gun case. That was a beating case. Ernest Woodard, Shante Early, Valesha Soroushian, Leonard Holt, Shannon Senegal. All right. And then there was an expert who testified about the board. Okay. And so all of those witnesses, one of them said something about that he got in the car and then he went back and gave more of a beating, and then there wasn't there, didn't one of the witnesses at some point, there was a statement introduced about what he had said about the crime. Yes. What was that statement? It was Shannon Senegal the next day asked Cook, like, I mean, what happened, basically, and Cook had the exact words I don't know, but the idea was that Sadler had stolen drugs from him, and that was the reason. Okay. So to convict him on, and so the confession, that we're talking the confession, didn't reference the Sadler, there's no reference to Sadler at all? There's not, Your Honor. Okay. So to convict him on the Sadler one, they would have had to resolve the inconsistent, the statements they made to the police and then the statements they made at trial and what they believed. Well, Shannon Senegal did not recant at trial. Those statements came in unrecanted. The experts or the witnesses who alleged coercion and recanted were Woodard and Early. So we have Valicious Soroushian, who encountered Mr. Cook as he was leaving the scene, described him as laughing, saying, you might want to go check on this guy, he might be dead. And then also the next day, Shannon Senegal asking and having Mr. Cook explain what happened. So neither of those witnesses recanted. For Betancourt, I think there were seven witnesses that gave statements to police that in the Cook. Mr. Betancourt. Yeah, in Mr. Betancourt. It seems like at least Mr. Cook points out, and you can tell me if this is correct or not, four of the witnesses recanted at trial, two received lenient plea deals for their testimony, and Sims was the only other suspect. And according to, I guess, Mr. Cook actually murdered Betancourt. The district court, from what I'm seeing here, said that many of these witnesses' statements were compromised in some way, either due to alleged police misconduct in feeding details or threatening the witnesses or because the witness was also a suspect and thus had a motive to fabricate. The district court did not make any factual findings to whether the coercion was actually true, but he made many of these findings with respect to these witnesses. And so you disagree with the district court's findings here? You think that was incorrect? Well, this is in the prejudice analysis. Yeah, that's what I'm asking about. Again, I don't think the district court made factual findings for the purposes of our review. He made these findings somehow during the course of his review of the case, the district court did. He came to those conclusions, yes. And so you think those conclusions are wrong or factually incorrect? I don't think they are wrong or factually incorrect. I think they are incomplete. Okay. I think that the district court does. I mean, the district court pointed to Nate Gardner's testimony being uncompromised. They point to the fact that all the other compromised witnesses' prior statements are consistent with Nate Gardner's description of what happened, despite those witnesses' later recantations. And then, you know, there's more to it than just that these witnesses recanted and therefore we shouldn't. Tell me what is the more to it so that I can understand your best position here. Again, it's Nate Gardner being uncompromised. You have the prior statements of the compromised witnesses actually supporting Nate Gardner's testimony. You have the bullets from the autopsy matching the bullets from Morris, suggesting the same gun was used. Cook's the only one who's common between the two. And then there are no, like I was just saying, there are no other common suspects present at both scenes. And that's, I think, enough because all we're doing at this point is are there any reasonable bases for the California Supreme Court's denial. This is not a de novo review of what happened in the trial court. You know, and what Mr. Cook says in response to Mr. Gardner, because I think that's what you're left in the focus on, I guess Mr. Cook disputes that Gardner's testimony could have sustained his conviction for the Benton Court murder since Gardner admitted he could not distinguish between Cook and another man who was driving the vehicle. What's your response to that? I'm sorry, Your Honor, I lost you about halfway through your question. He's saying, because you're pointing to Gardner as being kind of the real possible witness that somebody could have looked toward in convicting Mr. Cook. And Cook points out and disputes that Gardner's testimony could have sustained Cook's conviction for the Benton Court murder since Mr. Gardner admitted he could not distinguish between Cook and another man who was in the vehicle. What's your response to that? Aside from the fact that there was just a single shooter. I don't think that that affects Mr. Gardner's testimony at all because he drove Mr. Cook away from the scene and he asked Mr. Cook, what just happened? And Mr. Cook said he tried to gaffle, like he tried to steal from me. That's what Nate Gardner testified to. So the fact that he couldn't distinguish between Mr. Cook and somebody else, I really don't think it's relevant to the overall impact of Mr. Gardner's testimony. It seems like for the, I know you may disagree, but I'd like to give you a chance to respond. For the Morris murder, you know, Cook's confession, it seems could be problematic. Two of the witnesses, Branner and Senegal, were themselves suspects, were they not? I believe they were because they were in the car with him. And were granted leniency for testifying against Cook. And then one bystander eyewitness, I think it was Ms. Bradford, offered an inconsistent account. Do you agree with that? Inconsistent in the sense that, yes, she's saying Senegal told her. And the defense was also able to introduce some evidence that Branner was the actual shooter through the testimony of Monique Barrett and Lakeisha Smith. It seems like that may have further, you know, weakened the government's case. Did the jury know all of that? Absolutely. The jury knew all of that. But they also heard the confession. And they also heard from Sharoon Reed, who is not a suspect in the case. And they also heard the confession. And they also heard the confession, Your Honor. And that's the point here. I understand that the jury heard all of that. And the question is, was the confession, did it affect the outcome so much? And I'm just struggling a bit because the Supreme Court has told us how powerful a confession can be. So I'm just trying to look at this as carefully as possible. And I understand the arguments you're making. I just wanted to give you an opportunity to respond to my concerns. I appreciate that, Your Honor. And I don't think there's anything more I can say on it other than what I've already said and what's in the briefing. And I really appreciate that. Thank you. I know that I'm over my time. Well, we purposely, there's a lot of questions we all have. If there are no other questions on that, there is one point I would like to make. Go ahead. On the Eatman allegation, because I think that was brought up on questioning of my counsel. I want to make very clear that the state doesn't condone or defend the kind of conduct that was alleged here by Sergeant Eatman. But there is reasonable basis in the record for the California Supreme Court's denial of that claim. Aside from everything that has already been mentioned, including the fact that there was this 10-year delay. Well, okay, so on that Eatman claim, if it were true, that could certainly affect the voluntariness, correct? So how do we analyze this? I mean, I brought up with we don't know about it for 10 years, which I think is odd that we don't know about it for 10 years. And so I'm having a hard time. And so what did the district court do with that? What did the district court do with the Eatman allegation? How did the district court handle that? You're talking. Your Honor, I don't know off the top of my head. I know that the district court didn't reach voluntariness because, and I think they just moved into prejudice. The district court just moved into prejudice, finding there was no prejudice. I'm not sure how much analysis actually happened on the Eatman and maybe. Okay. But they wanted a hearing on it. Didn't they want a hearing on the Eatman? They wanted to develop. And didn't the district court deny a hearing on that? Or was it the California Supreme Court that denied a hearing on that? Someone denied a hearing. So there was a request for a hearing in the California Supreme Court state habeas petition, and that was denied. To further develop the Eatman testimony, right? In the California Supreme Court, I'm not sure if that was that specific or if it was limited to Eatman. There was just a hearing, a request for a hearing for that. But the denial of a hearing is reviewed for an abuse of discretion. And so if the record refutes the factual allegation or precludes the relief, the district court is not required to hold a hearing. And in here, I think that both of those things happened. I think that because of the district court's finding of no prejudice, even if we were to assume the truth of the Eatman allegation and that confession is excised, we'd still end up in the prejudice realm. And for reasons already discussed, there was no prejudice resulting from the admission of the confession. And so relief is not, you know, D-1 isn't satisfied. So there's no federal habeas relief. The California Supreme Court has its own standards, how it applies the, you know, assumption of truth to allegations. And it's not going to do that if the allegations are conclusory or if they're not reasonably supported by or supported by reasonably available evidence. And because the allegations occurred so far in the past, because there was so much time between when it happened and when it was raised, there are missed opportunities where that factual record could have been developed. It could have been raised at trial. We would have had a trial transcript involving Sergeant Eatman being confronted with that allegation. We don't have that. It could have been raised, as most trial court errors of this nature are, on direct appeal. And it wasn't raised there. So we have no, you know, nothing from the California Supreme Court on direct appeal. On state habeas, both defense attorneys executed declarations, and there's nothing about this allegation in either of the defense counsel's declarations. So when you don't have anything to support a bald allegation, and it's a serious allegation, given the nature, if you don't have anything to support it, California Supreme Court is not going to assume the truth of that allegation. Now, I know that counsel points to the whole, after the alleged conduct occurred, there was this statement by Mr. Cook that you all can just shoot me or whatever. That's probably the only piece of evidence that they cite to. But he referenced being killed at least six times prior to that conduct, prior to the 30-minute break, prior to Sergeant Eatman allegedly doing this. He told officers six times, something to the effect of you all can just go ahead and, not you all, but just kill me. So there's no reason to believe that that post-alleged coercion or statement was anything other than a continuation of what he had already, you know, the emotions and the sentiments he had already been displaying. I don't think it's connected at all to the alleged conduct. Okay. I don't think we have any additional questions. Does anyone have additional questions? Okay, thank you. Thank you, Ms. Farha. Okay. So I'll give counsel four minutes for rebuttal. Thank you, Your Honor. I want to make just two very brief points and then spend the rest of my time on prejudice. On the question of whether the district court made factual findings, and here I'm quoting from page 19 of volume 1 of the excerpts of record, the district court said,  given substantial evidence of his inability to comprehend his rights, including his youth, low IQ, psychological deficiencies, inability to follow verbal instructions, dissociation, and his statements to interrogators that he did not understand he had the right to a lawyer present at his interrogation, a contrary conclusion is unreasonable. That statement necessarily entails a factual finding that the evidence in support of that statement was true. And so there wasn't any. I'll be fair with you. When I read that, I said to myself, what the district court did is the same thing that I'm going to do when I'm approaching this particular problem on this prong of the analysis. I'm going to weigh everything that's pro, everything that's con, everything that's good. I'm going to put it all out there. And at that point, if I follow an analysis, I'm going to say could the Supreme Court of California have come down differently? And the problem that I have with that analysis is that this judge, the good district judge, didn't do that. And it seemed to me, as counsel has pointed out, he was not trying to make any finding. He was just weighing it just as I would under the same kind of analysis. Well, so there's two things going on. Formally, it's a mixed question of law and fact, right? The question is what did my client understand about the warnings? That's a fact question about what was inside his mind. And here we've got the district court crediting the evidence of his inability to comprehend his rights. Well, I mean, I could go through. I mean, the bottom line is, Counselor, and this is why I questioned you about this a little bit, it seems to me that if I'm going to weigh this as a district court and I'm going to have the California Supreme Court have not said anything, then I'm going to look back at the evidence or the, if you will, the analysis I have to make on it for review and say what is there in this record which would support what the California Supreme Court did and what is there that would not? And this judge said, I just don't think there's enough to support it, and came down on that analysis. I don't think he was making any findings of fact. There's nothing in there that would suggest that. He's just coming down on his analysis about what that court should have done. Well, I want to move on to prejudice if I may, Your Honor. I'm just letting you respond. Yes. Because I'll be fair with you. If you can't respond to that, I'm having a tough time. I do want to respond. I think it's quite clear in here that as a predicate to determining the legal question of what was a reasonable conclusion or not, the district court credited certain factual evidence and said that this, and that is exactly what the district court did in Brumfield v. Cain, where the district court credited factual evidence. And so the district court basically said that the State court was unreasonable in making that determination that it was a knowing Miranda waiver. Yes, Your Honor. Okay. And so I'd just like to very quickly move on to prejudice, because the important point here is that the prejudice is reviewed overall. So it's not just that there was a confession. It's also the trial counsel didn't introduce the contrary evidence that the ballistics in Betancourt proved beyond a shadow of a doubt that Cook could not have killed Betancourt, and in fact, Sims, the State's star witness, was the murderer. So you have to take all of those violations together and then determine whether or not there was prejudice. And to Your Honor's point, I agree that on its face this is not the most rock-solid confession, but then you add in the other prejudice that you get from Cook's own trial counsel telling the jury this confession is true, he really did it, and when that is a disputed confession for another murder, all of that prejudice carries through. And when you've got confessions to two murders that are essentially identical, which is to say the version of Walter Cook that the jury saw was someone who goes into rage blackouts and kills without remorse, and that prejudice simply unambiguously carries over to all three counts, because it's essentially there's a gun versus a board, but it is the same essential fact pattern. And so it's impossible to unscramble that omelet. There is prejudice for all three counts, regardless of joinder. And if there are no further questions, we ask that the Court remain in the district court. When instructions are not issued. Kagan. Thank you both for your helpful argument in this matter. This case will stand submitted.
judges: Callahan, N.R. Smith, Murguia